Argued at Pendleton May 7, reversed September 24, 1929.

## H. B. DAVIDHIZAR *v.* F. H. GAULKE.

(280 Pac. 499.)

For appellant there was a brief over the names of *Mr. J. A. Burleigh* and *Mr. Sylvester H. Burleigh,* with an oral argument by *Mr. J. A. Burleigh.*

For respondent there was a brief over the names of *Messrs. Green & Hess* and *Messrs. Senn & Recken,* with an oral argument by *Mr. R. J. Green.*

McBRIDE, J.—The pleadings are lengthy and much of the testimony relates to other matters not involved in this appeal. There is one question, and only one, at issue on appeal, and that is, whether or not Gaulke purchased the judgment obtained by the Federal Reserve Bank against Davidhizar on his own account, or upon an agreement with Davidhizar to purchase it at a discount for the benefit of Davidhizar upon Davidhizar paying the amount to Gaulke which he had paid the receiver of the insolvent Joseph Bank the then holder of the judgment. If such an agreement is established by the preponderance of the evidence, the decree of the Circuit Court is correct. If not, the case should be reversed. The parties had been intimately associated in business transactions for a number of years. Defendant was president of the First Bank of Joseph and plaintiff was the vice-president and a director. Plaintiff was a farmer by occupation and seems not to have taken an active part in the bank, but had extensive farming interests, and was jointly interested with defendant in the ownership of a large tract of land in Wallowa County. Perhaps, owing to their frequent business relations, they seem to have transacted their business with each other rather loosely, and it is perhaps owing to this fact more than any desire of either to get the better of the other that the misunderstanding has arisen which finally culminated in this lawsuit.

It seems to have been to the interest of both parties, and, in particular to Davidhizar, that this judgment, which was a lien upon all his ranches, should be gotten

rid of and he claims that defendant informs him that he could buy it at a discount and for his benefit, and that he authorized defendant to so purchase it.

Mr. McCully, who was for a time the receiver of the First National Bank of Joseph, among other things, testified as follows:

"Q. Now then when this note was reduced to judgment by the Federal Reserve Bank, after that time, what statements, if any, did you hear Mr. Gaulke make relative to the purchase of it?

"Mr. Burleigh.—Objected to as immaterial.

"The objection is overruled by the court.

"A. I don't know as to a particular statement. Mr. Gaulke talked about,—several different times, they wanted to sell him the assets of the bank, and that was along the summer after action started,—I guess was the last time I remember of talking to him about it,—that he would not be interested in any, in taking them over, unless it was to protect his vice-president there on that judgment,—Davidhizar."

Mrs. Bragg, who was employed as bookkeeper and assistant cashier of the First Bank of Joseph of which defendant was president and Davidhizar vice-president, among other matters, testified as follows:

"Q. And now I will ask if later you made a statement at the request of Mr. Gaulke to give, or made a statement of the account of Mr. Davidhizar. A. Yes.

"Q. I hand you this statement marked for identification, plaintiff's Exhibit 'G,' and ask if that is the statement prepared by you? A. Yes, I prepared that statement.

"Q. At whose request did you prepare that? A. Mr. Davidhizar requested a statement from Mr. Gaulke, and at Mr. Gaulke's request I made that out.

"Q. You made this out at Mr. Gaulke's request? A. Yes.

"Q. And on this line here,—this particular line, 'F. H. Gaulke judgment from First National against Davidhizar $750.00,' at whose request did you put that down? A. Mr. Gaulke's.

"Q. That was given to you by Mr. Gaulke to be put in that statement? A. Yes. I wouldn't know where else to get it, if he hadn't given it to me."

The subject matter of this testimony was that the defendant was asked for a statement of the obligations of Davidhizar to defendant and Frank Kernan and a list thereof was prepared by Mrs. Bragg under the supervision of defendant. Among other items charged against Davidhizar in this list is the following: "F. H. Gaulke judgment from First National against Davidhizar, $750.00."

Mrs. Bragg testified that the other items were taken from the books, but this item was not on the books but was included by the express direction of the defendant.

The statement shows that on November 15, 1926, a note payable to Gaulke and Kernan was executed which included this $750, which plaintiff claims was the amount charged by defendant for the judgment purchased by defendant from the receiver of the First National Bank. The note, as indicated by this statement, was for the sum of $14,167.61, and it is not questioned that the sum of $750 indicated by the statement was included therein.

The plaintiff, among other matters, testified as follows:

"Q. What did he say to you about buying the judgment? A. He told me a number of times, I can buy that judgment at a discount for you.

"Q. What was it he said? A. He could buy it at a discount.

"Q. For whom? A. For me.

"Q. Did he say he would buy it for you? A. Yes.

"Q. And that was definitely understood was it? A. Yes.

"Q. What did you say to him about that? A. We had to take it up before we could make this loan on the Ragsdale farm. I told him to go ahead and buy it.

"Q. Do you know whether or not he did go ahead and buy it? A. He told me he did.

"Q. Now just explain to the court the conversation you had with him about the judgment after he bought it? A. Well, one day I came to the bank there, and he met me just as I came to the door there, and he was standing—I don't know what you call it,—by the little room right this side of where the cashier's desk is, and he says, 'How much do you want off of me for the judgment.' He said, 'Seven hundred and fifty dollars,'—I was to pay him for the judgment.

"Q. He said seven hundred and fifty dollars? A. Yes.

"Q. Did you pay him the seven hundred and fifty dollars for the judgment? A. I did."

There are some other circumstances that bear remotely in favor of the contention of plaintiff, but the foregoing excerpts constitute the principal facts which are urged to sustain his contention, and based upon this testimony the circuit judge expressed the following opinion:

"As to the third cause of suit set forth in the complaint in which plaintiff seeks to enjoin the collection of a judgment in favor of the Federal Reserve Bank of San Francisco, California, against the plaintiff and C. L. Hartshorn the clear preponderance of the evidence shows that the defendant purchased this judgment for the plaintiff and that the plaintiff was to get the benefit of any discount. The plaintiff testified that the defendant purchased the judgment for him along with other assets of the First Bank of Joseph, and that he asked the defendant how much he wanted

for the judgment and defendant said $750.00 and he would satisfy the judgment in full. The defendant denied any such conversation. The plaintiff's testimony is corroborated by the testimony of Mrs. Bragg and Ex. 'G,' which she made out at the dictation of the defendant. The plaintiff is also corroborated by other evidence in the case. The evidence further shows that this sum of $750.00 was included in a note for $14,167.61, executed and delivered by plaintiff and wife to defendant.''

The defendant, on the other hand, testified positively that no such agreement was ever made. His testimony on that subject is as follows:

''Q. Now taking up the next cause of suit here, in regard to this judgment wherein Mr. Davidhizar claims he was to have a full release and satisfaction of that judgment, just state what the facts are about that, and what the agreement was between you and Davidhizar relative to that matter. A. Mr. Davidhizar and I never had any conversation about my purchasing that judgment for him. In fact, I never talked to Mr. Davidhizar until the day he signed up the mortgage papers in the bank, and I told him then I was charging $750.00 for the partial release of the judgment—a partial release.

''Q. At that time he was indebted to the firm of yourself and Frank Kernan pretty heavily was he not? A. Well, he owes us more than we care to have him owe.

''Q. About what did it run approximately at that time? A. Well, the total of that would be around, a little better than $13,000.00.

''Q. What are the facts about the Ragsdale place, that part of it that Mr. Davidhizar owned, about his renewing his mortgage on it? A. It could not be changed without getting a satisfaction of the judgment.

''Q. He was wanting to change mortgages was he? A. Not only that, but compelled to do it in order to take up this other mortgage,

"Q. He was paying off the old mortgage as I understand and giving a new mortgage? A. Yes.

"Q. To the Joint Stock Land Bank of California? A. That was the idea.

"Q. And it was understood,—it was necessary for him to get that judgment off of there? A. Yes.

"Q. Did you ever at any time agree to give him a full and complete satisfaction of that judgment? A. I did not,—not for $750.00."

Mr. Landon, formerly liquidating agent of the assets of the Federal Reserve Bank in connection with the First National Bank, and, who, subsequent to his resignation as such agent, joined with defendant in the purchase of the remaining assets of the First National Bank of Joseph, including the judgment in question, testified that he knew of the Davidhizar judgment and how it was regarded as to value by the bank and himself, and that it was regarded as a valuable asset. Among other things, he testified as follows:

"Q. Now as a joint holder with Mr. Gaulke in that judgment, did you ever give your consent, or did you ever authorize the full and complete satisfaction of that judgment for $750.00? A. No, sir.

"Mr. Green.—Objected to as incompetent, irrelevant and immaterial.

"The Court.—That is immaterial. The objection is sustained. It is answered.

"Q. When you did consent to the release of it for $750.00, state what sort of a release, or what part of the judgment you would authorize the release of? A. I authorized or insisted, that only the Ragsdale ranch was to be released.

"Q. You were in the abstract business here, and there was an abstract made of that ranch at about that time, wasn't there? A. Yes.

"Q. You made that abstract? A. Yes.

"Q. You saw the record there and knew that it was a partial release A. Yes.

"Q. On the Ragsdale place only? A. Yes.

"Q. Have you at all times since, and now,—have you ever waived or consented to a full release of that judgment? A. No, sir.

"Q. You still regard it as a live judgment and enforcible, do you?

"Mr. Green.—This all goes under our objection.

"The Court.—Yes."

The testimony of J. A. Burleigh, who, after stating that Gaulke had put the matter of his claim against Davidhizar in his hands for collection; that Davidhizar had disputed the claim, and that Mr. Kernan thought that, if he could be present at a meeting between Mr. Burleigh and Davidhizar, he might be able to bring about a settlement, then continued.

"A. * * And so one evening was arranged in which Mr. Davidhizar and Mr. Kernan was to come down, and see if we could reach a settlement, and we spent one whole evening from seven o'clock or half past seven, and was there until late bedtime, trying to get the matter settled, and I had been authorized by Mr. Gaulke,—I told him about the meeting, and he authorized me to settle with Mr. Davidhizar on what he was claiming,—he was claiming something like twenty-five hundred or twenty-five hundred and fifty dollars,—I forget which it was,—twenty-five hundred, but to settle for two thousand dollars,—that was the minimum; he wouldn't go under two thousand. So I made that offer to him, and in addition to paying the two thousand, he was to return, or repay Mr. Gaulke the three hundred and eighty-two dollars he had paid to the Stockgrowers & Farmers National Bank for Mr. Davidhizar on his note to get the stock released. We spent that evening there threshing the matter out, and just as we were going to adjourn the meeting Mr. Davidhizar said to me, that he would go home and talk it over with his wife and let me know later whether he would accept the offer, and that is all that was done that evening.

"Q. Did he ever let you know what decision he had arrived at? A. Yes, Mr. Davidhizar was back in the office, I would judge about ten days later,—maybe two weeks, and he told me that he would accept the offer, providing that Mr. Gaulke would turn over the old notes in this,—that was in this sixty thousand dollar mortgage,—cancel and surrender that note that Mr. Davidhizar had given Mr. Gaulke as the commission note on the loan out here on the place, that somebody had made a loan on through Mr. Gaulke, and Mr. Davidhizar said Mr. Gaulke promised him, if the place wasn't sold within a certain time,— * *

"A. (Continuing.) If the place wasn't sold within a certain time Mr. Gaulke was not to enforce the note against him, and that Mr. Gaulke should turn the stock back,—the Black Marble stock. I told him that I would communicate that to Mr. Gaulke, and I thought that would be all right. And I did so,— notified Mr. Gaulke of his acceptance on that condition, and Mr. Gaulke said that that was perfectly agreeable to him, except he wouldn't turn the stock back, but he wanted it held as security for the debt. Now in this settlement there Mr. Davidhizar was to have time. Mr. Gaulke said he would not insist on the payment of the money there, the two thousand dollars and the three hundred and eighty-two dollars, if Mr. Davidhizar would secure him so he would get it, said he would give him until fall on it, or a reasonable time to pay it. And when Mr. Gaulke said he would do that, I immediately notified Mr. Davidhizar,—communicated with him,—that was here in Enterprise, and Mr. Davidhizar was working on a ditch,— building a ditch, and he told me he didn't have time then to fix up the note, but as soon as he got through with the ditch, he would do so, and made the statement that we would have a credit on them or something in connection with the ditch up there, that Mr. Gaulke and Mr. Kernan was to stand some of the expense of building that ditch, and I told him all right. I notified Mr. Gaulke that he was coming down shortly to fix it up, and for him to have his notes, and

when he came down to fix it up, I would have him come down. It run along for some time and Mr. Davidhizar didn't come, and I wrote him a letter, and then later I saw him here in the courthouse, down here in the corridor of the courthouse, and called his attention to it, and told him Mr. Gaulke was very anxious to get that closed up; and he said then he was busy in his harvest, and he could not take the time to attend to it then, but he would shortly. And he didn't come down for quite a while, and I didn't see him for quite a while, and when I did see him, he came to the office over there,—in response to another, —I wrote him another letter, and I prepared a note,— one of these collateral form notes, made out for the amount of $2382.00 and mailed it to Mr. Davidhizar, and asked him to sign it up and mail it back. And he didn't and in answer to that, but some little time after I wrote him the letter, he came into the office, and he said he had decided not to give a note; that he could not do it, and refused. That was the end of it.''

There was a lengthy cross-examination and further redirect examination, but the foregoing gives the substance of his testimony.

The whole case, in effect, hinges upon proof by plaintiff that defendant bought the bank judgment against Davidhizar as the agent of Davidhizar and for his benefit. The evidence of this agreement is far from being strong. Davidhizar swears in a general way that defendant said, ''I can buy that judgment for you at a discount,'' and that he said, ''Go ahead and buy it.'' He does not testify that he made any inquiry as to what the proposed discount was liable to be, or as to when defendant was to purchase it or to how or when the purchase price was to be paid, or in what way defendant was to be secured for the expenditure in buying the judgment. In short, his testimony is

rambling and inconclusive as to circumstances concerning which ordinarily the attendant facts are clear to a business man. If defendant had bought the judgment at a price of $750, or any other sum, and had tendered it to plaintiff and demanded the money he had paid, he would have had a difficult task to make his case good in court upon showing the same facts which are testified to by plaintiff.

■ It should be remembered that defendant had a judgment good on its face, and a lien on plaintiff's other property on its face capable of being enforced against plaintiff's personal property. The judgment speaks for itself. The burden of showing that it has been released, or equitably satisfied, is on plaintiff.

Mr. McCully's testimony, that on one occasion when he and defendant were discussing the probability or desirability of defendant's purchasing the remaining unsold assets of the defunct First National Bank of Joseph, that defendant stated that he would not be interested in such a proposition except to protect his vice-president, is but little corroboration of plaintiff's claims. Perhaps, very naturally, defendant felt that it would not be to the credit of his own bank for the property of its vice-president to be sold on execution. If the judgment could be purchased by defendant and thus held in friendly hands, this contingency would be averted. Very naturally also, as defendant and Kernan contemplated so arranging affairs that plaintiff could get rid of the lien on this judgment on the Ragsdale place which they had sold to plaintiff so as to enable plaintiff to remortgage that property of another institution and thus obtain an extension of time for payment which would improve the prospects of defendant and Kernan getting their money on the second mortgage which they were

taking on the same land. But this would not necessarily indicate that defendant would be inclined to make plaintiff a present of the whole judgment, or, indeed, of any part of it beyond releasing the lien of it upon the particular tract in which defendant and Kernan were interested. Kernan being equally interested in the Ragsdale tract, which they were selling to plaintiff, it was but natural that Kernan should be the recipient of one half of the proceeds obtained, or to be obtained, from plaintiff as a consideration for the alleged partial release and hence the sum of $750 was naturally and properly included in the demand of Gaulke and Kernan, which was to be a second lien on the property. With the remainder of the judgment, which was Gaulke's undivided property, Kernan had nothing to do, and it could therefore cut no figure in plaintiff's settlement with the partnership of Gaulke and Kernan. This furnishes an explanation as to why, in the settlement with Gaulke and Kernan, the stenographer was told to include the $750 item which pertained to both Gaulke and Kernan, and why the remainder of the judgment, which pertained only to Gaulke and was his individual property, was not included. In the settlement with the partnership of Gaulke & Kernan, only that part of the judgment which pertained to both, the lien on the Ragsdale tract, was being considered. The words "judgment from First National Bank vs. Davidhizar" do not necessarily impart that the whole judgment of the bank was intended to be included although they will bear that construction. In considering what was meant in connection with the business then in hand, namely the settlement of affairs between the partnership and defendant, it was not necessary that the whole judgment should be included because Kernan's

interest only extended to one half of the $750, and viewed in this light, the words "$750.00 in judgment from," *et cetera,* are far from being conclusive against the contention of defendant, although the learned trial judge seems to have attached almost conclusive importance to them.

On the other hand, the defendant absolutely and positively denies that he purchased the judgment for plaintiff, or even agreed to do so, and there is no circumstance, which, in our view, corroborates plaintiff's testimony as to such a promise. Plaintiff's financial ship was on the rocks with a bare hope of saving it by making a new mortgage, which he was anxious to do, but not able to do except by getting rid of the lien on the Ragsdale tract which he had bought from defendant and Kernan. With that out of the way he would probably be able to refinance himself and save not only that tract but all his other ranches and the judgment would still be a good live asset. It was considered of some value by the receiver and possibly was one of the principal reasons why defendant was willing to pay $6,000 for the fag end of the assets still held by the Federal Reserve Bank. In addition to this, we place great reliance upon the testimony of Mr. Burleigh. He is a man of character in his profession and it is part of a lawyer's business to be accurate. His testimony is positive that early in July, 1927, he had a meeting with Davidhizar when the claims of this plaintiff and defendant were thoroughly gone over and discussed in which he, acting for Gaulke, proposed to take $2,000 in settlement of the disputed claim on the judgment and $382 in settlement of the amount claimed by Gaulke in settlement of the amount advanced by Gaulke to take up the certifi-

cates of the Black Marble Company stock. To which offer plaintiff replied that he would take the offer under advisement, consult with his wife and inform Mr. Burleigh later. Thus far Mr. Burleigh is corroborated by Mr. Kernan, who was present at the interview. Burleigh further testified that later plaintiff came to the office and verbally accepted the offer, but put off executing a note and other necessary formalities on the ground that he was busy with other matters, promising to come in later for that purpose, and that he finally came in and said that he had concluded not to execute the note. Whether or not these verbal negotiations and admissions of plaintiff are sufficient in themselves to constitute a substantive cause of suit need not here be discussed. They evidently indicate that at the end of discussions and explanations, plaintiff, after reflection, believed that something was due defendant, and, acting on that belief, he promised to settle upon the terms indicated by Mr. Burleigh. This testimony is absolutely denied by the plaintiff, but his testimony is so uncertain and clearly erroneous in respect to other matters, that we are disposed to accept Burleigh's testimony at its face value.

■■ The burden of proof as to the agreement of defendant to buy the federal reserve judgment at a discount for the benefit of the plaintiff and give him the benefit of such discount is upon the plaintiff, and, while we regret to disagree with the learned trial judge in his estimate of the value of the testimony, we are of the opinion that the preponderance of the testimony is in favor of defendant's contention. The excerpt taken from the opinion of the circuit judge indicates to our minds that he based his judgment largely upon the item in the statement of the account

between Gaulke and Kernan and the plaintiff, whereas, in our opinion, in view of the circumstances attending the making of the memorandum, it possesses slight evidentiary value.

The decree will therefore be set aside and a decree entered here in accordance with defendant's contention in this regard. Both parties have done business together so loosely as to leave room for just such misunderstandings as have occurred here and in view of all the facts, neither party will recover costs and disbursements in the lower court, but the defendant will recover his costs and disbursements on this appeal.          REVERSED AND DECREE ENTERED.

RAND and ROSSMAN, JJ., concur.

BEAN, J., dissents.